**Sharee MILLER, Petitioner,**

v.

**Clarice STOVALL, Warden, Robert Scott Correctional Facility, Respondent.**

No. 05–73447.

United States District Court, E.D. Michigan, Southern Division.

Aug. 27, 2008.

Bridget M. McCormack, Kimberly A. Thomas, University of Michigan, Ann Arbor, MI, for Petitioner.

Brenda E. Turner, Janet Van Cleve, B. Eric Restuccia, Debra M. Gagliardi, Michigan Department of Attorney General, Lansing, MI, for Respondent.

### OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

VICTORIA A. ROBERTS, District Judge.

## I. INTRODUCTION

Before the Court is Sharee Paulette Miller's ("Petitioner")" Objections to Magistrate's Report and Recommendation and Request for Oral Argument. The Court held oral argument on August 8, 2008.

For the reasons stated below, the Court:

(1) **GRANTS in part and DENIES in part** the Objections;

(2) **ADOPTS in part and REJECTS in part** the reasoning of the Report and Recommendation;

(3) **REJECTS** the recommendation of the Report and Recommendation; and

(4) **CONDITIONALLY GRANTS** the Petition for Writ of Habeas Corpus.

## II. BACKGROUND

Following a jury trial in Genesee County Circuit Court on January 29, 2001, Petitioner was convicted of conspiracy to commit first-degree murder and second-degree murder, as an aider and abettor. Bruce Miller was the victim's husband. Petitioner allegedly conspired to have him killed by her lover, Jerry Cassaday. The state court judge sentenced Petitioner to life in prison on the conspiracy conviction, and a concurrent term of 54–81 in prison on the second degree murder conviction.

Petitioner appealed as a matter of right to the Michigan Court of Appeals on the following grounds:

(1) The trial court violated the Michigan Rules of Evidence and Petitioner's Confrontation Clause rights by admitting, over objection, hearsay testimony from a suicide note, AOL instant messages, and emails between Petitioner and her alleged coconspirator;

(2) The prosecutor and the trial court violated Petitioner's due process right to a fair trial by permitting over objection, emails including semi-nude and erotic photographs and videotape of Petitioner, which the Court opined in the presence of the jury was pornographic; and

(3) The trial court violated Petitioner's due process right to a fair trial by permitting over objection, the admission of gruesome photographs of her alleged coconspirator depicting a bullet hole in his head while sitting in a recliner with an open bible in his lap.

The Michigan Court of Appeals found no merit to these claims and denied Petitioner's appeal on June 24, 2003. *People v. Miller*, No. 233018, 2003 WL 21465338 (Mich.Ct.App. June 24, 2003) (per curiam).

On March 8, 2004, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which significantly altered Supreme Court Confrontation Clause jurisprudence. On April 1, 2004, the Supreme Court of Michigan denied Petitioner's request for leave to appeal. *People v. Miller*, 469 Mich. 1029, 679 N.W.2d 66 (Mich.2004). Petitioner filed a motion for rehearing in light of *Crawford*, which was denied on June 30, 2004. *People v. Miller*, 469 Mich. 1029, 682 N.W.2d 93 (2004).

Petitioner applied for a writ of habeas corpus on September 7, 2005. The Petition argues:

(1) She was denied her Sixth Amendment right to Confrontation when the state court decided her case contrary to and unreasonably applied clearly established federal law;

(2) The state court made an unreasonable determination of facts when it admitted hearsay evidence; and

(3) The state court violated Petitioner's due process rights by permitting the introduction of prejudicial and irrelevant evidence, which cumulatively had the effect of violating her right to a fair trial.

The R & R incorporates the Michigan Court of Appeal's statement of facts:

On November 9, 1999, [Petitioner's] husband, [Bruce Miller] was shot and killed at [B & D Auto, his auto shop business]. Three months later, [Petitioner's] lover, [Jerry] Cassaday, committed suicide. Cassaday left a suicide note that described how [Petitioner] and Cassaday had planned to kill [Bruce Miller], and it also described how Cassaday followed through with the plan and killed [Bruce Miller]. Cassaday also left a copy of America On Line ("AOL") "instant messages" he exchanged with [Petitioner] on November 7, 1999, and November 8, 1999, which detailed their scheme to kill [Petitioner's] husband. Also, numerous e-mail communications between [Petitioner] and Cassaday were recovered from Cassaday's computer hard drive.

Cassaday and [Petitioner] wrote the e-mails between August and November 1999 and they reveal the extent of their relationship, their future plans to marry, [Petitioner's] false claim that she was pregnant, and her desire to kill her husband.

At trial, [Petitioner] denied any involvement in her husband's murder. However, based on the above evidence, prosecutors argued that [Petitioner] manipulated Cassaday into killing her husband by claiming that her husband abused her. Prosecutors also presented evidence that, on two occasions, [Petitioner] falsely told Cassaday that she was pregnant with his children, but that the unborn babies died from her husband's abuse. The jury convicted Miller of conspiracy to commit first-degree murder and second-degree murder [as an aider and abettor].

R & R at 4–5; *Miller,* 2003 WL 21465338, at *1.

This summary omits reference to an important circumstance detailed in 3 Petitioner's statement of facts:

> Within 24 hours of Bruce Miller's death the police had a suspect: John Hutchinson. Both Hutchinson and Bruce Miller were the targets of an ongoing criminal investigation by the Genesee County Auto Investigation Network for tampering with Vehicle Identification Numbers (VIN). Though Hutchinson denied any involvement with the VIN switching, he was ultimately charged with two felony counts before pleading guilty to a misdemeanor charge. Harold Hutchinson, John Hutchinson's brother and an employee at B & D, testified that prior to the murder, John Hutchinson had threatened to "dispose of" Bruce Miller because of both the criminal investigation and a dispute over a loan. Harold Hutchinson also testified that around

> 7:00 p.m. on the night of the murder, John Hutchinson told Harold Hutchinson on the phone that he had "disposed of Bruce Miller." Harold Hutchinson understood John to mean that John had killed Bruce Miller.

> The morning after the murder, before learning of Bruce Miller's death, John Hutchinson's step-son Anthony Birch told police that, on the night of the murder, John Hutchinson was not home between 5:30 and 7:30, and that when John Hutchinson returned home he was acting "strange."

> The prosecution successfully barred Mrs. Miller from introducing into evidence results of a polygraph test that indicates that John Hutchinson was "deceptive" when denying his involvement in Bruce Miller's murder.

Petition at 9–10 (internal citations omitted).

The Magistrate recommends the Court deny the Petition. Although he found that Petitioner's Confrontation Clause rights were violated by the admission of Cassaday's suicide note, and that the Michigan Court of Appeals unreasonably applied the clearly established law of *Crawford,* he determined this error was harmless. The Magistrate found the Petition otherwise lacked merit.

Petitioner objects to the Magistrate's Report and Recommendation ("R & R") on several grounds:

(1) In addition to being an "unreasonable application of" clearly established federal law as found by the Magistrate, the admission of the suicide note was "contrary to" clearly established law;

(2) Respondent waived any objection that the constitutional violation of admitting the suicide note was harmless;

(3) The Magistrate erred in finding that admission of the suicide note was harmless;

(4) The Magistrate erred in finding the instant messages were not testimonial;

(5) The Magistrate erred in finding Cassaday's instruction to his brother did not implicate the Confrontation Clause; and

(6) The Magistrate erred in concluding that the admission of inflammatory evidence did not violate Petitioner's right to a fair trial.

## III. STANDARD OF REVIEW

### A. Generally

Because she filed her petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its provisions govern. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir.2007).

### B. § 2254(d)

Under AEDPA, § 2254(d) governs the Court's habeas corpus review of state court decisions:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;* or

(2) resulted in a decision that was based on an *unreasonable determination of* the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). The "contrary to" and "unreasonable application of" prongs are independent. A state court decision can be both "contrary to" and "an unreasonable application of" "clearly established" law. *Williams v.*

*Taylor*, 529 U.S. 362, 385, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The arguments underlying Petitioner's Objections implicate only subsection (1) of § 2254(d).

### 1. Clearly Established Law

■ "Clearly established Federal law" includes law that qualifies as an "old rule" under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), with the additional limitation that it is restricted to Supreme Court precedent. *Williams*, 529 U.S. at 379–384, 120 S.Ct. 1495. Under *Teague*, an old rule is defined as one which does not break new ground or impose a new obligation on the states or the federal government, or is "dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 381, 120 S.Ct. 1495.

■ This Court is to be guided by law that was clearly established at the time Petitioner's conviction became final. *Stallings v. Bobby*, 464 F.3d 576, 581 (6th Cir. 2006). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Clearly established law refers only to the holdings—not dicta. *Id.* at 71, 123 S.Ct. 1166. Further, an explicit statement by the Supreme Court is unnecessary; "the legal principles and standards flowing from Supreme Court precedent also qualify as 'clearly established law.' " *Lakin v. Stine*, 431 F.3d 959, 961 (6th Cir.2005).

Notwithstanding this guidance, the path to identification of "clearly established law" is not always clear. *Andrade* addressed the lack of clarity under the "unreasonable application" prong of § 2254(d). *See Andrade*, at 72–73, 123 S.Ct. 1166; *see also* Melissa M. Berry, *Seeking Clarity in*

the Federal Habeas Fog: Determining What Constitutes "Clearly Established" Law Under the Antiterrorism and Effective Death Penalty Act, 54 Cath. U.L.Rev. 747, 773–783 (2005).

A commentator cited by the Tenth Circuit summarized the inquiry into "clearly established" law as follows:

> [T]he Supreme Court's decisions in Williams, Andrade, and Alvarado provide a context for understanding the meaning of clearly established law. First, they define clearly established law as the Court's holdings and (revealing a broad reading of the requirement) reasonable applications of the Court's precedent. Second, they instruct that the determination of clearly established law should be a threshold issue. Where the Court's precedents were not "clear," it did not deny relief on that basis alone. Instead, it analyzed the clarity of the law under the unreasonable application prong. Third, these decisions confirm that broad principles can qualify as clearly established law, but they also reveal that the broader the principle, the more likely the state court's decision will be reasonable.

Berry, supra at 788.

■ The Magistrate correctly determined that Petitioner's conviction became final on September 28, 2004, ninety days after the Michigan Supreme Court denied her motion for rehearing. Onifer v. Tyszkiewicz, 255 F.3d 313, 317–318 (6th Cir. 2001); R & R at 12–14. The Court must examine clearly established federal law as of September 28, 2004.

## 2. Contrary to Clearly Established Law

■■ A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413, 120 S.Ct. 1495. Citing Williams, the Sixth Circuit explains that "[a] state-court decision is considered 'contrary to . . . clearly established federal law' if it is 'diametrically different, opposite in character or nature, or mutually opposed.'" Ivory v. Jackson, 509 F.3d 284, 291 (6th Cir.2007) (quoting Williams, 529 U.S. at 405, 120 S.Ct. 1495); Mahdi v. Bagley, 522 F.3d 631, 636 (6th Cir.2008) (unpublished).

■ The mere failure to cite Supreme Court precedent does not require a finding that the decision is contrary to clearly established law. Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). Indeed, a decision may comport with clearly established law even if the decision does not demonstrate an awareness of relevant Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

## 3. Unreasonable Application of Clearly Established Law

■ An "unreasonable application" of clearly established federal law occurs when a state court "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of a prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. 1495. A district court must apply an objective test of reasonableness in deciding whether there has been an "unreasonable application." Id. at 410–411, 120 S.Ct. 1495. A reasonable application includes at least those instances where fair-minded jurists could disagree about the state court's conclusion. See Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("Ignoring the deferential standard of § 2254(d)(1) for the moment, it can be said

that fair-minded jurists could disagree over whether [the petitioner] was in custody."). There is an important distinction between unreasonable and erroneous, and it is not enough to find that a state court decision applied clearly established federal law erroneously or incorrectly; the application must also have been unreasonable. *Williams,* 529 U.S. at 409–413, 120 S.Ct. 1495; *Ivory,* 509 F.3d at 291.

■ When determining whether a state court reasonably applied Supreme Court precedent, district courts are not limited to the precise, narrow, fact-specific results of Supreme Court decisions. "[A] state court decision makes 'an unreasonable application of this Court's precedent' when the court 'unreasonably extends a legal principle from our precedent to a new context where it should not apply ...' but, ... a lower court also errs when it 'unreasonably refuses to extend that principle to a new context where it should apply.'" *Taylor v. Withrow,* 288 F.3d 846, 851 (6th Cir.2002) (quoting *Williams,* 529 U.S. at 407, 120 S.Ct. 1495) (emphasis omitted); *see also McCalvin v. Yukins,* 444 F.3d 713, 719–722 (6th Cir.2006) (refusing to extend principle on several grounds).

■ In *Yarborough v. Alvarado,* Justice Kennedy summarizes the general approach district courts should employ when examining the reasonable application of clearly established federal law:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unrea-

sonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough,* 541 U.S. at 664, 124 S.Ct. 2140 (internal citations omitted).

### C. § 2554(a)

.Satisfaction of § 2254(d) is not enough to grant the writ. Petitioners must also meet the requirements of § 2254(a):

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

■ The Sixth Circuit recently made clear that under § 2254(a), a petitioner may not obtain relief on the basis of a state court decision that was "contrary to" or an "unreasonable application of" a Supreme Court precedent that is no longer good law. *Desai v. Booker,* 538 F.3d 424, 427 (6th Cir.2008) (published).

The Magistrate correctly reasoned that the overturned Supreme Court precedent of *Roberts* is irrelevant, and Petitioner's only cognizable claim under § 2254 is a state court decision that was "contrary to" or "an unreasonable application of" *Crawford.*

## IV. ANALYSIS

### A. The Court Must "Look Through" the Supreme Court of Michigan Standard Orders to the Michigan Court of Appeals Explained Decision .

■ When deciding a habeas petition under § 2254 the Court must look to the

last explained, reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–806, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.1991); *Griffin v. Berghuis*, 298 F.Supp.2d 663, 672 (E.D.Mich.2004).

## B. The Court's Analysis of the State Court Decision

### 1. The Suicide Note

#### i. The Decision Was Not Contrary to the Clearly Established Law of *Crawford*

 The Michigan Court of Appeals decision was not contrary to *Crawford*. The state court applied the correct governing law, but unreasonably found that the suicide note was not testimonial, and applied *Roberts*. Because at the time the conviction became final the application of *Roberts* was not " 'diametrically different, opposite in character or nature, or mutually opposed,' " to *Crawford*, the state court decision was not "contrary to" *Crawford*. *Ivory*, 509 F.3d at 291 (quoting *Williams*, 529 U.S. at 405, 120 S.Ct. 1495); *Mahdi*, 522 F.3d at 636; *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.

The Court denies this objection.

#### ii. The Michigan Court of Appeals Decision Was an Unreasonable Application of *Crawford*

At oral argument, Respondent took the position that the possible applicability of a dying declaration exception to the Confrontation Clause somehow bound the Court to the state's supposed evidentiary ruling that the suicide note was a dying declaration. That argument is without merit.

This Court's review solely focuses on the violation of the Constitution as interpreted by the Supreme Court. *See Calvert v. Wilson*, 288 F.3d 823, 830 (6th Cir.2002) (citing *Lilly*, 527 U.S. at 134, 119 S.Ct.

1887) ("The *Lilly* Court first said that *it was irrelevant* that all statements against penal interest of an unavailable witness were treated as firmly rooted exceptions to the hearsay rule under Virginia law.") (emphasis added).

The Magistrate noted that it is not clear whether the Supreme Court accepts a dying declaration exception to Confrontation Clause protections, *Crawford v. Washington*, 541 U.S. 36, 56 n. 6, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). This Court adopts the Magistrate's reasoning and conclusion that the suicide letter was not a dying declaration under Supreme Court precedent. Moreover, the trial court did not admit the suicide note as a dying declaration; it admitted it under the state's residual exception rule. *Miller*, 2003 WL 21465338 at *2; MRE 804(b)(7) (previously codified as 804(b)(6)).

#### iii. Harmless Error

##### a. Generally

 Confrontation Clause errors are subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir.2003). Petitioner is not entitled to habeas relief unless the error was not harmless.

##### b. Waiver

 The Magistrate concluded that although the Michigan Court of Appeals erred in admitting the suicide note, this error was harmless. Petitioner objects that Respondent waived a harmless error argument by not raising it in its Response.

Petitioner's position has merit. The Sixth Circuit has held repeatedly that this defense to habeas corpus relief can be waived. *See Hargrave v. McKee*, 248 Fed. Appx. 718, 728 (6th Cir.2007) (unpublished); *Payne v. Bell*, 399 F.3d 768, 784 n.

5 (6th Cir.2005) *withdrawn on other grounds and substituted by Payne v. Bell,* 418 F.3d 644 (6th Cir.2005) *see also United States v. Ford,* 184 F.3d 566, 578 n. 3 (6th Cir.1999).

In addition, a plain reading of § 2254 does not contradict, and in fact strengthens, the Court's view that Respondent's argument is waived. Although not mentioned by Petitioner, the Court notes that § 2254 directly addresses the question of waiver under § 2254(b)(3). The subsection provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). This statement is the only reference to waiver within the text of § 2254. This provision indicates that Congress believed waiver was possible under § 2254, and acted only to limit its availability when exhaustion and estoppel are at issue.

Respondent waived a harmless error argument by not raising it in her brief. Therefore, the Court grants the objection.

### c. The Error Was Not Harmless

■ Even if Respondent did not waive a harmless error argument, the error was not harmless. "The Supreme Court recently made clear 'that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness.'" *Hargrave*, 248 Fed.Appx. at 728 (internal citations omitted) (quoting *Fry v. Pliler,* —— U.S. ——, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007)); *Jensen v. Romanowski,* 564 F.Supp.2d 740, 749 (E.D.Mich. 2008); *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Thus, " '[o]n collateral review, an error is deemed harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.' '" *Hamilton v. Morgan,* 474 F.3d 854, 867 (6th Cir.2007) (quoting *Stapleton v. Wolfe,* 288 F.3d 863, 867 (6th Cir.2002)). If the Court is uncertain, but has " 'grave doubt' as to the harmlessness of the error, it 'should treat the error, not as if it were harmless, but as if it affected the verdict. . . .' " *Id.*

■ *Delaware. v. Van Arsdall* sets forth the factors to consider in harmless error analysis:

(1) the importance of the witness' testimony in the prosecution's case;

(2) whether the testimony was cumulative;

(3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

(4) the extent of cross-examination otherwise permitted; and

(5) the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431; *Vasquez v. Jones,* 496 F.3d 564, 574–575, 574 n. 8 (6th Cir.2007) (quoting *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431); *Hill,* 337 F.3d at 718 (specifically addressing second degree murder under Michigan law); *Romanowski,* 564 F.Supp.2d at 749.

■ It is important to note that although corroboration is irrelevant to an initial determination of a Confrontation Clause violation, *Lilly,* 527 U.S. at 137–138, 119 S.Ct. 1887 (1999) (citing *Idaho v. Wright,* 497 U.S. 805, 822–823, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)), it is a relevant factor under the harmless error analysis. *Bobby,* 464 F.3d at 582–583; *Hill,* 337 F.3d at 715–716.

After determining the Michigan Court of Appeals unreasonably applied *Crawford,*

the Magistrate analyzed the error as harmless:

Nevertheless, the Court should conclude that the error in the admission of this evidence was harmless, and that petitioner is therefore not entitled to habeas relief. In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court ruled that trial error does not entitle state prisoners to habeas relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Confrontation Clause violations are subject to harmless error analysis. *See Lilly v. Virginia,* 527 U.S. 116, 139–40, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Viewed in isolation, Cassaday's suicide note implicating petitioner was certainly damaging. However, in the context of the trial, the statement was cumulative of, and less significant than, petitioner's own statements describing her role in the crimes as reflected in the instant messages between her and Cassaday. Significantly, Cassaday's suicide note states only that petitioner was involved, without providing any details of that involvement. The instant messages, on the other hand, show in detail petitioner's active involvement in the instigation and planning of the murder. In these circumstances, where the improperly admitted evidence is cumulative of more damaging evidence which was properly admitted, it cannot be said that the admission of the note had a substantial and injurious effect on the jury's verdict. *Cf. United States v. Meserve,* 271 F.3d 314, 330 (1st Cir.2001); *United States v. Abadie,* 879 F.2d 1260, 1264 (5th Cir.1989). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this ground,

notwithstanding the trial court's error in admitting the suicide note.

R & R at 23–24.

Petitioner objects to this conclusion because: (1) the prosecution relied heavily on the suicide note; (2) the evidence was not cumulative; (3) strong evidence implicated another suspect; (4) the suicide note lacked descriptive detail; and (5) the overall weakness of the evidence.

The Magistrate primarily relied on two court of appeals decisions with citation with "Cf.," from outside the Sixth Circuit on direct review of federal district court evidentiary rulings, *United States v. Abadie,* 879 F.2d 1260, 1265 (5th Cir.1989) and *United States v. Meserve,* 271 F.3d 314, 332 (1st Cir.2001). However, neither case has been cited within the Sixth Circuit, nor do they directly address the *Brecht standard and Van Arsdall* factors, all of which must be considered. *See Bobby,* 464 F.3d at 582. Moreover, the Magistrate failed to specifically address, and differentiate the elements of, the two crimes for which Petitioner was convicted. R & R at 24. Faced with a harmless error inquiry for a second degree murder conviction, the Sixth Circuit explained:

In determining whether the error in this particular case is harmless, we must decide whether the other evidence, including [Petitioner's] own statement, *is overwhelming and sufficient to establish the elements of second-degree murder and armed assault with intent to rob beyond a reasonable doubt.* Otherwise, we must find that the introduction of [the witness'] statement actually prejudiced [Petitioner], [and therefore,] had a "substantial and injurious effect" under *Brecht* ....

*Hill,* 337 F.3d at 718 (emphasis added); *Hargrave,* 248 Fed.Appx. at 728 ("[The witness'] testimony was integral to the prosecution's case, as she was the only

eyewitness to the alleged crimes and was the only witness who could provide any testimony regarding two necessary elements of the crime of carjacking ....."); *see also e.g. Robinson v. Gundy,* 174 Fed. Appx. 886, 893 (6th Cir.2006) (unpublished) ("The evidence against [petitioner] was truly overwhelming.").

## I. Conspiracy

Under Michigan law, "conspiracy requires proof of the unlawful agreement; nothing further. is required." *Northington v. Elo,* No. 97–1590, 1999 WL 149664, *3 (6th Cir. Mar. 3, 1999) (unpublished) (citing *People v. Burgess,* 153 Mich. App. 715, 396 N.W.2d 814, 825 (Mich.Ct. App.1986)). The prosecution must "establish that defendant intended to combine with two or more persons to accomplish first-degree murder." *People v. Merko,* No. 271800, 2008 WL 747094,.at *2, 2008 Mich.App. LEXIS 590, at *6 (Mich.Ct.App. Mar. 20, 2008) (unpublished) (citing *People v. Justice,* 454 Mich. 334,.345, 562 N.W.2d 652 (1997)). "The crime is complete upon formation of the agreement." *Justice,* 454 Mich. at 346, 562 N.W.2d 652.

In addition, "[f]or intent to exist, the defendant must know of the conspiracy, must know of the objective of the conspiracy, and must intend to participate cooperatively to further that objective." *Merko,* 2008 WL 747094, at *2, 2008 Mich. App. LEXIS 590, at *6 (citing *People v. Blume,* 443 Mich. 476, 485, 505 N.W.2d 843 (Mich.1993)). Noting that "[i]dentifying the objectives and even the participants of an unlawful agreement is often difficult because of the clandestine nature of criminal conspiracies," the Supreme Court of Michigan held "direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties," and that "[i]nferences may be made because such evidence sheds light on the coconspirators' inten-

tions." *Justice,* 454 Mich. at 347, 562 N.W.2d 652.

Reliance on the cumulative nature of the suicide note and the instant message has some merit. All that the prosecution needed to demonstrate was an agreement to cooperate in the murder of Mr. Miller. As the Magistrate noted, "[t]he instant messages ... show in detail Petitioner's active involvement in the instigation and planning of the murder, and a suicide note confirming the murder took place, and Petitioner's involvement, is arguably cumulative evidence of an agreement to commit murder." R & R at 24. However, under *Van Arsdall,* the cumulative nature of the evidence in relation to the conspiracy conviction is just one of several factors the Court must examine, and the additional factors leave the Court with "serious doubt" about the harmless nature of the error.

First, the instant messages were, at least somewhat, susceptible to forgery. The jury appears to have accepted the instant messages as a non-forgery. However, "a federal habeas court need not defer to the state-court factfinder's credibility determinations when reviewing an error for harmlessness." *Vasquez v. Jones,* 486 F.3d 135, 148 (6th Cir.2007) (citing *Fulcher v. Motley,* 444 F.3d 791, 809 (6th Cir.2006)). Doubt was cast on the origin of the instant message recordings during trial. The inclusion of the suicide note served to corroborate the veracity of instant message recordings, and without this note, the authenticity of the recorded instant messages is thrown into stronger doubt. *Bobby,* 464 F.3d at 582–583 ("[The] jury could have believed that the ... [the] statements 'reinforced and corroborated each other' " and that "without one ... the fact-finder might not have believed the other."); *Hill,* 337 F.3d at 715–716. Moreover, no other evidence besides the suicide

note and the instant message recordings provided strong evidence of *an agreement* to kill Mr. Miller; thus, the existence of one piece of evidence reinforced the other.

Second, "the extent of cross-examination otherwise permitted" would have been the full cross-examination of Cassaday and his allegations, which were the impetus and foundation of the charges against Petitioner. Third, the overall strength of the prosecution's case was not strong, relying only on circumstantial evidence. While it is true that "direct proof of the conspiracy is not essential," the use of circumstantial evidence is nonetheless less powerful evidence of a conspiracy, and the nature of the evidence must be taken into account when evaluating harmlessness. *Justice,* 454 Mich. at 347, 562 N.W.2d 652.

Although it is a close question, the Court is left with a "grave doubt" concerning the harmlessness of the error. *Morgan,* 474 F.3d at 867; *Stapleton,* 288 F.3d at 867.

The Court grants the objection on this conviction.

## II. Second Degree Murder

To prove second degree murder under Michigan law, the State must prove that there was: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without justification or excuse. *Hill,* 337 F.3d at 719 (citing *People v. Goecke,* 457 Mich. 442, 579 N.W.2d 868, 878 (1998)). The suicide note is not cumulative to the instant message recordings for the second element of second degree murder: a death was caused by the defendant. *See Hargrave,* 248 Fed.Appx. at 728.

Indeed, the suicide letter is the only strong evidence supporting the finding that Cassaday "caused" Mr. Miller's "death," and the prosecution did not offer physical evidence linking Cassaday or Petitioner to the murder of Bruce Miller. *See Vasquez,* 486 F.3d at 148 ("No physical evidence linked the accused to the murder weapon."). Nor can Respondent argue that the aiding and abetting theory under which Petitioner was convicted commands a different result. Even a vicarious liability theory requires a "death" "caused" by the principal, the point on which the suicide note was the only strong evidence. *See People v. Robinson,* 475 Mich. 1, 6, 715 N.W.2d 44 (Mich.2006).

Thus, the suicide note was especially important evidence for the second degree murder charge; it is the only strong evidence available to prove Cassaday—not a different viable suspect—actually carried out the murder. There is no corroboration of this evidence of the *murder* of Mr. Miller *by Cassaday. Hill,* 337 F.3d at 715–716.

If anything, evidence points to a different suspect. The "extent of cross-examination otherwise permitted" would have been the full cross-examination of Cassaday, and his allegations, which were the impetus and foundation of the charges. The overall strength of the prosecution's case was even weaker for the second degree murder charge than it was for conspiracy, because the suicide note is the only evidence that Cassaday actually killed Mr. Miller. During closing argument, the prosecution specifically pointed to the suicide note to respond to the argument that there was another viable suspect.

Lastly, the Michigan Court of Appeals's admission of the suicide note under MRE 804(b)(7) (previously codified as MRE 804(b)(6)), because it was "more probative on the point for which it was offered than any other evidence which the proponent could procure through reasonable efforts," undercuts the argument that it was not very important evidence, on the charge of second degree murder. *See Dorchy v. Jones,* 398 F.3d 783, 791 (6th Cir.2005).

In light of these facts, the Court is left with a "grave doubt" as to the harmlessness of the error on the conviction for second degree murder. *Morgan,* 474 F.3d at 867; *Stapleton,* 288 F.3d at 867.

### 1. The Instant Message Recordings

The Court adopts the Magistrate's reasoning and conclusion and denies the objection.

### 2. Instructions to Brother

Review of Petitioner's brief to the Michigan Court of Appeals reveals this claim was not raised on appeal in the state court proceedings. Therefore, the Court cannot grant relief; Petitioner failed to meet exhaustion requirements of § 2254(b)(1). *Hannah,* 49 F.3d at 1195; *Magett v. Bell,* 2008 WL 2357716, at *2, 2008 U.S. Dist. LEXIS 44408, at *5 (2008); Petition at 2–3.

### 3. The Prejudicial Evidence

#### i. Evidentiary Rulings

 Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding. *Coleman v. Mitchell,* 244 F.3d 533, 542–543 (6th Cir. 2001); *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Only where the violation of a state's evidentiary rule results in the denial of fundamental fairness, thereby violating due process, will federal courts provide habeas corpus relief. *Cooper,* 837 F.2d at 286. "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend ... some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.2003) (quotation omitted). A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamen-

tally unfair as to violate the petitioner's due process rights. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir.2000).

The Magistrate correctly ruled on this claim. The Court adopts his reasoning and denies the objection.

#### ii. The Cumulative Effect of Prejudicial Evidence

 The Sixth Circuit holds cumulative constitutional errors are not cognizable habeas claims. *See Cross v. Stovall,* 238 Fed.Appx. 32, 41 (6th Cir.2007) (unpublished); *Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir.2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be, it binds us.") (citation omitted); *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir.2005) ("[N]ot even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."); *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir.2002); *Stallings v. Bagley,* 561 F.Supp.2d 821, 847 n. 8 (N.D.Ohio 2008).

Petitioner's claim for cumulative constitutional errors from admission of prejudicial evidence is without merit. In contrast, Petitioner *may* allege the admission of a single piece of evidence was so prejudicial on its own, that it resulted in a violation of her due process rights.

However, Petitioner does not object to the Magistrate's conclusion that none of the evidence, standing alone, was so prejudicial that its admission violated Defendant's right to due process. Moreover, the Court adopts the Magistrate's reasoning and conclusion that the independent admission of the evidence was not so prejudicial that it violated due process. *Coleman,*

244 F.3d at 542; *Cooper,* 837 F.2d at 286; R & R at 27–30.

The Court denies the objection.

## V. CONCLUSION

The Court:

(1) **GRANTS in part and DENIES in part** the Objections. The Court **GRANTS** Petitioner's objections to the Magistrate's conclusion that admission of the suicide note was harmless error, and that harmless error was not waived and **DENIES** the Petitioner's objections regarding the instant messages, Cassady's instructions to his brother, and inflammatory evidence.

(2) **ADOPTS in part and REJECTS in part** the reasoning of the Report and Recommendation,

(3) **REJECTS** the recommendation of the Report and Recommendation; and

(4) **CONDITIONALLY GRANTS** the Petition for Writ of Habeas Corpus because the admission of the suicide note was an unreasonable application of *Crawford,* Respondent waived harmless error, and the admission of the suicide note was not harmless.

The State must take steps to retry Petitioner within 60 days, or release her.

**IT IS ORDERED.**

## *REPORT AND RECOMMENDATION*

PAUL J. KOMIVES, United States Magistrate Judge.

### *Table of Contents*

I. RECOMMENDATION ...............................................984

II. REPORT .......................................................984
 A. *Procedural History* ........................................984
 B. *Factual Background Underlying Petitioner's Conviction* ..................985
 C. *Standard of Review* .......................................986
 D. *Confrontation Clause Claim (Claim I)* ........................987
 1. *The Hearsay Evidence and the State Court Proceedings* ..............987
 a. Suicide Note ........................................987
 b. Electronic Messages ....................................988
 c. Instructions to Cassaday's Brother .........................988
 2. *Clearly Established Law* ..................................988
 a. The Current State of the Law: Roberts and Crawford ............988
 b. The Applicability of Crawford .............................990
 c. The Applicability of Roberts .............................991
 3. *Analysis* ...........................................993
 a. Suicide Note ........................................993
 b. Instant Message Transcripts ..............................997
 c. Cassaday's Instructions to His Brother .......................998
 E. *Evidentiary Claims (Claim II)* ..............................999
 1. *Clearly Established Law* ..................................999
 2. *Analysis* ...........................................999
 a. E–Mails, Pornographic Video, and Sexually Explicit
 Photographs ........................................999
 b. Photographs of Cassaday's Suicide ........................1001
 c. Cumulative Effect ....................................1001
 F. *Conclusion* ............................................1001

III. NOTICE TO PARTIES REGARDING OBJECTIONS .......................1001

I. *RECOMMENDATION*: The Court should deny petitioner's application for the writ of habeas corpus.

II. *REPORT*:

A. *Procedural History*

1. Petitioner Sharee Paulette Miller is a state prisoner, currently confined at the Scott Correctional Facility in Plymouth, Michigan.

2. On December 22, 2000, petitioner was convicted of one count of conspiracy to commit first degree murder, MICH. COMP. LAWS §§ 750.157a, 750.316; and one count of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Genesee County Circuit Court. On January 29, 2001, she was sentenced to a term of life imprisonment on the conspiracy conviction, and to a concurrent term of 54–81 years' imprisonment on the second degree murder conviction.

3. Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I. THE TRIAL COURT VIOLATED THE RULES OF EVIDENCE AND MRS. MILLER'S CONFRONTATION CLAUSE RIGHTS BY ALLOWING THE PROSECUTION, OVER OBJECTION TO INTRODUCE HEARSAY TESTIMONY IN A SUICIDE NOTE, A.O.L. INSTANT MESSAGE, AND E–MAILS BETWEEN MRS. MILLER AND MR. CASSADAY.

II. THE TRIAL COURT VIOLATED MRS. MILLER'S DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BY PROHIBITING DEFENSE COUNSEL, OVER OBJECTION, FROM ASKING PROBING VOIR DIRE QUESTIONS CONCERNING THE VENIRE'S EXPOSURE TO PRETRIAL PUBLICITY

III. THE TRIAL COURT VIOLATED MRS. MILLER'S DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BY ADMITTING INTO EVIDENCE, OVER OBJECTION, E–MAILS INCLUDING SEMI–NUDE AND EROTIC PHOTOGRAPHS AND VIDEO TAPE OF MRS. MILLER, WHICH THE COURT OPINED IN THE PRESENCE OF THE JURY AS "PORNOGRAPHIC."

IV. THE PROSECUTOR AND THE TRIAL COURT VIOLATED MRS. MILLER'S DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BY ADMITTING INTO EVIDENCE, OVER OBJECTION, GRUESOME PHOTOGRAPHS OF MR. CASSADAY DEPICTING A BULLET HOLE IN HIS HEAD WHILE SIT[T]ING IN A RECLINER WITH AN OPEN BIBLE IN HIS LAP.

V. THE TRIAL COURT ERRED IMPOSING A THIRTY–ONE YEAR UPWARD DEPARTURE.

The court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence. *See People v. Miller*, No. 233018, 2003 WL 21465338 (Mich.Ct. App. June 24, 2003) (per curiam).

4. Petitioner, through counsel, sought leave to appeal these five issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Miller*, 469 Mich. 1029, 679 N.W.2d 66 (2004). Subsequently, petitioner filed a motion for rehearing, arguing that the admission of the hearsay evidence violated the Confrontation Clause as interpreted in the United States Supreme Court's intervening decision in *Crawford v. Washington*. The Michigan Supreme Court denied petitioner's motion for rehearing in a standard order. *See People v. Miller*, 469 Mich. 1029, 682 N.W.2d 93 (2004).

5. Petitioner, through counsel, filed the instant application for a writ of habeas corpus on September 7, 2005. As grounds for the writ of habeas corpus, she raises the confrontation and evidentiary claims that she raised in the state courts, stylized thusly:

I. SHAREE MILLER WAS DENIED HER SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE MICHIGAN COURTS DECIDED CONTRARY TO, AND UNREASONABLY APPLIED, CLEARLY ESTABLISHED FEDERAL LAW AND MADE UNREASONABLE FINDINGS OF FACT IN ADMITTING TESTIMONIAL HEARSAY EVIDENCE.

 A. The Michigan state court failed to apply the clearly established rule of *Crawford v. Washington* to Mrs. Miller's case.

 B. The Michigan state court unreasonably applied clearly established federal law requiring sufficient guarantees of trustworthiness and made an unreasonable determination of facts when it admitted the hearsay evidence.

II. THE CUMULATIVE EFFECT OF PREJUDICIAL EVIDENCE IMPROPERLY INTRODUCED AT TRIAL VIOLATED SHAREE MILLER'S RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE.

 A. The state court violated Mrs. Miller's due process right to a fair trial when it admitted highly prejudicial but irrelevant evidence at her trial.

 B. The combined effect of admission of these pieces of evidence violated Mrs. Miller's right to a fair trial.

6. Respondent filed her answer on March 7, 2006. She contends that petitioner's claims are without merit, and that petitioner's evidentiary claims are not exhausted.

7. Petitioner filed a reply to respondent's answer on April 19, 2006.

B. *Factual Background Underlying Petitioner's Conviction*

The evidence at trial underlying petitioner's conviction was succinctly summarized by the Michigan Court of Appeals:

On November 9, 1999, defendant's husband was shot and killed at work. Three months later, Miller's lover, Cassaday, committed suicide. Cassaday left a suicide note that described how Miller and Cassaday had planned to kill the victim, and it also described how Cassaday followed through with the plan and killed Miller's husband. Cassaday also left a copy of America On Line ("AOL") "instant messages" he exchanged with Miller on November 7, 1999, and November 8, 1999, which detailed their scheme to kill Miller's husband. Also, numerous e-mail communications between Miller and Cassaday were recovered from Cassaday's computer hard drive. Cassaday and Miller wrote the e-mails between August and November 1999 and they reveal the extent of their relationship, their future plans to marry, Miller's false claim that she was pregnant, and her desire to kill her husband.

At trial, Miller denied any involvement in her husband's murder. [1]

1. Petitioner testified that she did not believe that Cassaday had murdered her husband, and the defense tried to establish that John Hutchinson, a suspect in the murder and a target, along with petitioner's husband, of an investigation into vehicle theft, was a more likely perpetrator.

However, based on the above evidence, prosecutors argued that Miller manipulated Cassaday into killing her husband by claiming that her husband abused her. Prosecutors also presented evidence that, on two occasions, Miller falsely told Cassaday that she was pregnant with his children, but that the unborn babies died from her husband's abuse. The jury convicted Miller of conspiracy to commit first-degree murder and second-degree murder.

*Miller*, 2003 WL 21465338, at *1, slip op. at 2.

## C. *Standard of Review*

Because petitioner's application was filed after April 24, 1996, her petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also, Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495); *see also, Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Bell*, 535 U.S. at 694, 122 S.Ct. 1843. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams*, 529 U.S. at 413, 120 S.Ct. 1495); *see also, Bell*, 535 U.S. at 694, 122 S.Ct. 1843. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520–21, 123 S.Ct. 2527 (citations omitted); *see also, Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. Further, the

"phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (citations omitted) (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. 1495).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362; *see also, Mitchell,* 540 U.S. at 16, 124 S.Ct. 7. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox,* 340 F.3d 667, 671 (8th Cir.2003); *Phoenix v. Matesanz,* 233 F.3d 77, 83 n. 3 (1st Cir.2000); *Dickens v. Jones,* 203 F.Supp.2d 354, 359 (E.D.Mich. 2002) (Tarnow, J.).

**D. Confrontation Clause Claim (Claim I)**

**1. The Hearsay Evidence and the State Court Proceedings**

Petitioner first claims that she was denied her Sixth Amendment right to confront the witnesses against her by the introduction of numerous hearsay statements. The hearsay evidence breaks down into three general categories: (1) Cassaday's suicide note; (2) a compilation of electronic messages exchanged between Cassaday and petitioner, included by Cassaday with the suicide note; and (3) Cassaday's instructions to his brother regarding the contents of the briefcase in which the suicide note and the electronic messages were found. All of the evidence was located in a briefcase under Cassaday's bed, discovered by his brother on the day following Cassaday's suicide. Cassaday's suicide postdated the murder of petitioner's husband by about three months. A proper resolution of petitioner's confrontation claim requires a detailed description of these categories of evidence, and the state courts' handling of the evidence.

**a. Suicide Note**

The first category of hearsay evidence consists of Cassaday's suicide note, which was addressed to his parents. The typewritten note [2] states, in relevant part:

> After sharee and I got together I found out she was married. she lied to me and lied to me, made promises as you well know and I believed them all. she got pregnant with my baby but her husband beat the crap out of her and killed my baby. she told me that there was nothing she could do because he was involved in organized crime and was afraid of being killed if she left him or tried to prosecute him.

> She got pregnant with the twins and this time he had some of his people gang rape her and beat the crap out of her some more until they killed my babies again. the man taunted me and taunted me. he threatened me. he sent me letters saying she was gonna have a miscarriage again then he did it, im sorry mom, those were my babies, I loved them, I wanted them.

**2.** At the bottom of the typewritten note is a handwritten note and Cassaday's first name.

I drove there and killed him.

Sharee was involved and helped sit it up, I have all the proof and I am sending it to the police, she will get whats coming. I have been so stupid, but now you know the real story of why I went into such a state of depression, nothing has helped, not the booze, the drugs or counselling because I just couldn't tell any one the truth.

I was so blind and so stupid and so much in live, little did I know she never meant any of it, she just wanted all her money and no more husband, well she got her wish, but she is soon to learn that she cant do that to people.

Def.-Appellant's Br. on Appeal, in *People v. Miller*, No. 233018 (Mich.Ct.App.), Ex. A.

### b. Electronic Messages

The second category of hearsay admitted at petitioner's trial consisted of printouts of electronic message conversations between petitioner and Cassaday. In the conversation, petitioner discusses the injuries she received from her husband, and apparently included photographs of those injuries. *See* Def.-Appellant's Br. on Appeal, in *People v. Miller*, No. 233018 (Mich. Ct.App.), Ex. B, at 1–2. More significantly, the two discuss the plan for the murder. In the electronic conversation, petitioner: gives Cassaday directions and advice for avoiding the police, *see id.* at 2–3; describes how she will make sure that her husband is alone so that Cassaday can kill him, *see id.* at 4; states that she has taken her husband's work checks and money, *see id.* at 5; tells Cassaday to take the victim's wallet and make the shooting look like a robbery, *see id.* at 5–6; and discusses the plan for after her husband is killed, *see id.* at 7–8.

### c. Instructions to Cassaday's Brother

The final category of hearsay admitted at petitioner's trial consists of the testimony of Cassaday's brother, Michael Cassaday. Michael testified regarding instructions from his brother in the event that something should happen to him, as well as the instructions written by Cassaday in connection with the instant message transcripts. Michael testified that several weeks prior to the murder, Cassaday said to him "hey, look, Mike, anything ever happens to me there is—there is a briefcase under—under the bed at home. He says, get—get a hold of the briefcase and you will know what to do with it then, so." Trial Tr., Vol. II, at 356. He also testified that when he found the briefcase, there was an envelope attached to the case addressed to Cassaday's attorney, and on that envelope was a handwritten note instructing Michael not to open the briefcase without someone else present. *See id.* at 359–60.

### 2. Clearly Established Law

The first task in analyzing petitioner's confrontation claim is to determine precisely what constitutes "clearly established federal law" with respect to the claim.

#### a. The Current State of the Law: Roberts and Crawford

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). At the time of petitioner's trial and appeal of right, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In *Roberts*, the Court explained that the underlying purpose of

the Confrontation Clause is similar to that of the hearsay rule, *i.e.,* to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts,* 448 U.S. at 66, 100 S.Ct. 2531.

As the Court explained in *Roberts,* reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright,* 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531 (internal quotation omitted).

In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial

statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354. The Court then explained that *Roberts's* allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id.* at 60–68, 124 S.Ct. 1354. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69, 100 S.Ct. 2531.

In *Crawford,* the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

■ *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and][3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52, 124 S.Ct. 1354 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.

### b. The Applicability of Crawford

The first question here is whether *Crawford* constitutes clearly established law governing petitioner's claim. *Crawford* was decided on March 8, 2004. Petitioner's direct appeal of right was decided by the Michigan Court of Appeals on June 24, 2003, prior to the issuance of the *Crawford* decision. However, the Michigan Supreme Court did not deny leave to appeal until after *Crawford,* and likewise did not deny petitioner's motion for reconsideration which explicitly raised *Crawford* until after that decision. The question, in determining the applicable clearly established law, is whether the Court should look to the time that the court of appeals, to whose decision this Court would be applying the § 2254(d) standard, decided petitioner's appeal, or rather to the time the direct appeal process became final by the conclusion of direct review or the time for seeking such review. As the Second Circuit has explained, this question is unresolved:

> The Supreme Court has provided inconsistent guidance on the precise time to which a federal court should look to assess what was "clearly established Federal law, as determined by the Supreme Court." In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), Justice Stevens, writing for a majority of the court, stated: "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established *at the time his state-*

> *court conviction became final." Id.* at 390, 120 S.Ct. 1495 (Stevens, J., for the court) (emphasis added). In a separate opinion, Justice O'Connor, also writing for a majority of the court, stated that the phrase "clearly established Federal law, as determined by the Supreme Court" refers "to the holdings, as opposed to the dicta, of this Court's decisions *as of the time of the relevant state-court decision." Id.* at 412, 120 S.Ct. 1495 (O'Connor, J., for the court) (emphasis added); *see also Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144.

*Brown v. Greiner,* 409 F.3d 523, 533 n. 3 (2d Cir.2005) (parallel citations omitted).

The better view is the view espoused by Justice Stevens. Although Justice O'Connor's opinion refers to the time of the "relevant state-court decision," it is not entirely clear what this means. Most likely, the "relevant" state court decision is the last state court decision which analyzed the merits of the claim, but this is not necessarily so. It could be that the "relevant" state court decision is the decision which establishes finality. A clue to the resolution of this question, however, is found in language in Justice O'Connor's opinion which immediately follows the language quoted above. In discussing the extent to which § 2254(d)(1) codifies the non-retroactivity principles of the Court's prior decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), Justice O'Connor noted that "whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)." This is important, because the dividing line between "old rules" and "new rules" in the *Teague* analysis is the date the conviction becomes

final by the conclusion of direct review or expiration of the time for seeking such review. *See Beard v. Banks,* 542 U.S. 406, 411, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004); *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). In other words, in this case *Crawford* would constitute an "old rule" under *Teague* as applied to petitioner, because that decision was issued prior to petitioner's conviction becoming final. And, by Justice O'Connor's reasoning, this "old rule" would also constitute clearly established law under § 2254(d)(1).

Although the courts, including the Sixth Circuit, have at times referenced both Justice Stevens's and Justice O'Connor's formulations, the most direct statement of the correct timing rule by the Sixth Circuit instructs that "[u]nder AEDPA ... [a court's] inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent *at the time [petitioner's] conviction became final." Onifer v. Tyszkiewicz,* 255 F.3d 313, 317–18 (6th Cir.2001) (emphasis added). In light of this language, and the language from both Justice Stevens's and Justice O'Connor's opinions for the Court in *Williams,* the Court should conclude that *Crawford* constitutes clearly established federal law as determined by the Supreme Court for purposes of petitioner's confrontation claims. *Cf. Turner v. Wolfenbarger,* No. 04–73821, 2006 WL 2070394, at *8 n. 4 (E.D.Mich. July 26, 2006) (Friedman, J.) (declining to apply *Crawford* because "*Crawford* was not clearly established law before Petitioner's conviction became final.").

### c. The Applicability of Roberts

As explained above, *Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. The question therefore remains whether *Rob-*

*erts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not testimonial hearsay under *Crawford.* Petitioner contends that *Roberts* retains its force with respect to non-testimonial hearsay, and that the Michigan Court of Appeals's decision was an unreasonable application of *Roberts* with respect to any non-testimonial statements which were admitted at her trial. Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here.

In *Crawford,* the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay. The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. Immediately following *Crawford,* the Courts concluded that *Roberts* remained applicable to non-testimonial hearsay, observing:

[t]he lynchpin of the *Crawford* decision thus is its distinction between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements.... [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks,* 395 F.3d 173, 179 (3d Cir.2005); *see also, Horton v. Allen,* 370 F.3d 75, 83–84 (1st Cir.2004); *United States v. Johnson,* 354 F.Supp.2d

939, 964 (N.D.Iowa 2005); *United States v. Savoca,* 335 F.Supp.2d 385, 391–92 (S.D.N.Y.2004). Regardless of whether this reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay. In *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id.* at 2274, and in doing so abrogated *Roberts* in whole. The Court noted that the answer to this question was suggested in *Crawford,* when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony." *Id.* (discussing *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354). The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered. *See Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 1183, 167 L.Ed.2d 1 (2007) ("Under *Roberts,* an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford,* on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Feliz,* 467 F.3d 227, 231 (2d Cir.2006); *Gabarrette v. Sullivan,* No. C 04–5454, 2007 WL 578991, at *9 (N.D.Cal. Feb. 21, 2007); *State v. Paiz,* 140 N.M. 815, 149 P.3d 579, 587 (N.M.Ct. App.2006); *Hodges v. Commonwealth,* 272 Va. 418, 634 S.E.2d 680, 689 (2006).

This conclusion is not altered by the fact that *Roberts* was clearly established federal law at the time the Michigan Court of Appeals decided petitioner's case. The jurisdiction of a federal court to issue a writ of habeas corpus is provided by § 2254(a), which grants jurisdiction to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) merely delineates a subset of these case in which habeas relief is not available. Thus, a finding under § 2254(d)(1) that the state court unreasonably applied *Roberts* would not automatically entitle petitioner to habeas relief if the admission of the evidence were nonetheless constitutional. As the Fourth Circuit has explained,

[n]either *Williams* nor § 2254(d)(1) requires issuance of a writ before determining the critical question of whether a prisoner is being held in violation of the Constitution or laws of the United States. Thus, the proper interpretation of the role of § 2254(d)(1) in habeas corpus review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied. *See [Williams,* 529 U.S.] at 412, 120 S.Ct. 1495 (deeming § 2254(d)(1) a "new constraint" on federal courts' power to issue writs and stating that a federal court "may" issue the writ upon determining that the standards found in § 2254(d)(1) are satisfied); *see also Weeks v. Angelone,* 528 U.S. 225, 237, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (referring to the issue under § 2254(d)(1) as whether habeas relief is "preclude[d]" or "prohibit[ed]," rather than whether such relief is mandated). Rather, § 2254(d)(1) must be read in conjunction with the purpose of the writ, as outlined in § 2254(a), which is to pro-

tect a prisoner from being held in violation of federal law. *Rose v. Lee,* 252 F.3d 676, 691 (4th Cir. 2001) (parallel citations omitted). In other words, even where a state court decision is unreasonable under § 2254(d)(1), "a prisoner must establish an entitlement to the relief he seeks" under § 2254(a) by demonstrating that he is being held in violation of the Constitution or laws of the United States. *Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.2003); *see also, Sarausad v. Porter,* 479 F.3d 671, 701–02 (9th Cir.2007) ("[T]o obtain habeas relief, a petitioner must show, in addition to a substantive federal constitutional violation, *see* § 2254(a)," one of the circumstances in § 2254(d)); *Palmer v. Clarke,* 408 F.3d 423, 436 (8th Cir.2005) ("Even if the [state] court erred in its analysis, [petitioner] is not entitled to relief on this ground unless his constitutional or statutory rights were violated.").

Here, even if the Michigan Court of Appeals erred with respect to its analysis of any non-testimonial hearsay under *Roberts,* petitioner would not be able to show a constitutional violation as required by § 2254(a), because the introduction of non-testimonial hearsay does not violate the Confrontation Clause.[3] Thus, in light of the language of § 2254(a) and the Court's decisions in *Crawford* and *Davis,* the Court should conclude that *Roberts* is irrelevant in this habeas proceeding. The only question before the Court with respect to petitioner's confrontation claims is whether the court of appeals's conclusion that the evidence was admissible was contrary to, or results from an unreasonable application of, the Court's decision in *Crawford.*[4]

### 3. Analysis

#### a. Suicide Note

After applying the *Crawford* standard, in light of § 2254(d)(1), the Court should conclude that the introduction of Cassaday's suicide note resulted from an unreasonable application of *Crawford.* Specifically, the suicide note clearly falls into two of the three formulations of testimonial identified by the Court in *Crawford. See Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354. At bottom, the suicide note is a confession by Cassaday, and thus fits with-

---

**3.** Although this result flows from a plain reading of § 2254, the conclusion is buttressed by the absurdity of a contrary result. For instance, suppose that the Court were to conclude that the Michigan Court of Appeals unreasonably applied *Roberts* with respect to a particular non-testimonial statement, and that this finding alone entitled petitioner to habeas relief. The actual relief to which petitioner would be entitled would be a new trial. However, at that new trial, the prosecution would be free to again introduce the non-testimonial statement, because under *Crawford* and *Davis* it is clear that the non-testimonial statement is not barred by the Confrontation Clause.

**4.** That the Michigan Court of Appeals did not itself consider *Crawford* (as that case had not been decided at the time of the court of appeals's decision), does not alter this formulation of the appropriate habeas standard. The question before both the court of appeals and

this Court is the same: whether the admission of the hearsay evidence violated petitioner's right to confront the witnesses. A court on habeas review does not assess whether a state court's reasoning is contrary to or an unreasonable application of clearly established federal law, only whether the ultimate conclusion is so. *See Merced v. McGrath,* 426 F.3d 1076, 1081 (9th Cir.2005) ("[I]t is the state court's decision, as opposed to its reasoning, that is judged under the 'unreasonable application' standard."); *Onifer,* 255 F.3d at 316 (citing *Harris v. Stovall,* 212 F.3d 940, 943 (6th Cir.2000)) ("[T]his court has held that even if a state court fails to articulate its reasoning for a decision on the merits, the deferential standards of AEDPA still apply."); *Cruz v. Miller,* 255 F.3d 77, 86 (2d Cir.2001) (in applying § 2254(d)(1), "we are determining the reasonableness of the state courts' 'decision,' not grading their papers.").

in the second category of testimonial hearsay. Further, the note clearly fits within the third category of statements, those made in circumstances in which an objective witness would expect that statements to be available for evidence at trial. Cassaday was a former police officer who clearly intended his letter to be found, a chain of evidence preserved (that is, through his instructions to his brother) and for the letter to be used as evidence against petitioner. He states his intention in the note itself, and planned in advance for his brother to find the letter and deliver it to the authorities. Indeed, apart from the formalized testimonial materials described by *Crawford's* first category of statements, it is difficult to conceive of testimonial hearsay which is more consciously designed to provide incriminating evidence than Cassaday's suicide note. And the clarity with which the note itself reveals its testimonial character renders a contrary conclusion unreasonable in light of *Crawford.*[5]

Respondent argues that the admission of the suicide note cannot be an unreasonable application of clearly established law as determined by the Supreme Court because the Court in *Crawford* did not hold that suicide notes constitute testimonial hearsay, nor did the Court adopt any of the three proposed formulations of testimonial hearsay. "A careful reading of the [Court's] language," respondent asserts, "leads to the conclusion that the Court clearly established only two types of statements as testimonial: *Ex Parte* testimony at a preliminary examination, and statements taken by police officers in the course of interrogations." Respondent's Answer, at 5. Respondent's argument, however, reads too narrowly both the § 2254(d)(1) focus on clearly established

law and the actual rule to be applied here. The rule of law which petitioner seeks to avail herself of here is not that the admission of suicide notes violates the Confrontation Clause, but that the admission of testimonial hearsay does so. And this is precisely the rule which is clearly established by *Crawford.* Indeed, respondent's argument would render the "unreasonable application" prong of § 2254(d)(1) meaningless. Under respondent's argument, a court could not grant habeas relief until the exact evidence at issue has been found by the Supreme Court to constitute testimonial hearsay. At that point, however, the state court's allowance of the evidence would not be an unreasonable application of Supreme Court precedent; it would be contrary to that precedent. This would violate both the general rule that a court must "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof," *Astoria Federal Savings & Loan Ass'n v. Solimino,* 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), and the Supreme Court's explicit admonition that "the 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams,* 529 U.S. at 405, 120 S.Ct. 1495; *see also, Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

As the Supreme Court has explained in the *Teague* context, legal rules fall on a spectrum of abstraction. At one end are rules so general that their application does not lead to predictable development in the law; at the other are bright line rules which essentially are applicable only in factually identical cases. In the middle are those general rules which constitute clearly established law in a wide variety of factual settings. These rules are no less

---

**5.** This is not to impugn the opinion of the Michigan Court of Appeals, which of course was without the benefit of the *Crawford* decision and which applied governing law extant at the time of its decision.

"old" ones under *Teague* merely because the require application on a case-by-case basis. *See Wright v. West,* 505 U.S. 277, 308–09, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (Kennedy, J., concurring in the judgment). Similarly, they are no less "clearly established" law because they define a general rule applicable in a wide variety of settings. *See Yarborough v. Alvarado,* 541 U.S. 652, 663–64, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (adopting Justice Kennedy's discussion in *Wright* in the context of the unreasonable application prong of § 2254(d)(1)).⁶ This conclusion is demonstrated by the fact that habeas relief may be granted under § 2254(d)(1) where "the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone,* 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (plurality op.); *McCalvin v. Yukins,* 444 F.3d 713, 719 (6th Cir.2006); *Arnett v. Jackson,* 393 F.3d 681, 686 (6th Cir.2005).

In short, that the Supreme Court has not considered whether the particular evidence at issue here constitutes testimonial hearsay does not render the *Crawford* rule which petitioner seeks to apply less than clearly established, nor render the state court's decision reasonable. *See Ward v. Sternes,* 209 F.Supp.2d 950, 955 (C.D.Ill. 2002). Put another way, "[i]n the case at bar, the clearly established federal law is that [testimonial hearsay is inadmissible without prior opportunity for cross examination]; the facts to which this law must be applied pertain to [Cassaday's suicide note]. The mere fact that [this particular issue] has not been litigated before the

U.S. Supreme Court does not warrant the conclusion that no prisoner may benefit from habeas for violation of this right." *Id.*

Nor can respondent prevail on the basis that Cassaday's suicide note constitutes a dying declaration immune from Confrontation Clause scrutiny. In *Crawford,* the Court suggested that testimonial dying declarations may be admissible notwithstanding the rule established in *Crawford.* After explaining that none of the Court's prior cases involving other hearsay exceptions resulted in admission of testimonial hearsay, the Court observed:

> The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*

*Crawford,* 541 U.S. at 55 n. 6, 124 S.Ct. 1354 (citations omitted). Although the majority of courts have interpreted this language as allowing admission of testimonial dying declarations under the Confrontation Clause, *see People v. Taylor,* 275 Mich. App. 177, 737 N.W.2d 790 (2007); *Williams v. State,* 947 So.2d 517, 520 (Fla. Ct.App.2006) (citing cases), at least two courts and one commentator have noted that the Supreme Court did not so hold in *Crawford,* and that such an exception can-

---

**6.** To be sure, the level of the rule's generality may bear on the question of whether a particular application was unreasonable. As the Court explained, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in

reaching outcomes in case-by-case determinations." *Yarborough,* 541 U.S. at 664, 124 S.Ct. 2140. This, however, goes to the reasonableness of a particular application of a rule, and not to whether the rule is clearly established.

not be reconciled with the logical and historical underpinnings of the *Crawford* decision. *See United States v. Mayhew*, 380 F.Supp.2d 961, 965–66 & n. 5 (S.D.Ohio 2005); *United States v. Jordan*, No. 04–CR–229–B, 2005 WL 513501, at *3 (D.Colo. Mar.3, 2005); Michael J. Polelle, *The Death of Dying Declarations in a Post-Crawford World*, 71 Mo. L.Rev. 285, 289–307 (2006). Like the Supreme Court in *Crawford*, the Court here need not decide this question because, in any event, Cassaday's suicide note does not constitute a dying declaration.

■■■ The dying declaration rule provides a hearsay exception for, "[i]n a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." FED. R.EVID. 804(b)(2); MICH. R. EVID. 804(b)(2). Here, Cassaday's suicide note does not constitute a dying declaration for two reasons. First, there is no evidence that the statement was made in belief of imminent death. The Supreme Court has emphasized that a dying declaration must be made not in contemplation of possible or even likely death, but in the face of imminent and apparently certain death; that is, the statement must be made in the "shadow of impending death." *Shepard v. United States*, 290 U.S. 96, 99, 54 S.Ct. 22, 78 L.Ed. 196 (1933). It is questionable whether a suicide which follows a declaration can constitute an impending death, *see Garza v. Delta Tau Fraternity Nat'l*, 948 So.2d 84, 94–95 (La.2006) ("When ... the deadly trauma ... was inflicted subsequent to the declaration, the mortality of an injury could not have been understood or realized by the decedent. The realization of immediate death must be present when the statement is made. The likelihood of death, the awareness of eventual death, or the intention to eventually inflict

death on one's self is not enough to place the declarant in the elevated sense of solemnity envisioned by the jurisprudence or the relevant codal provision."). Moreover, even assuming that a suicide can constitute an imminent death under the dying declaration exception, here there is no evidence as to when the suicide note was penned by Cassaday. If it was penned some time prior to the suicide—for example, when he told his brother several weeks earlier to look under the bed for a briefcase if anything happened to him—the declaration was not made in belief of impending death. *See United States v. Lemonakis*, 485 F.2d 941, 956 n. 24 (D.C.Cir.1973); *United States v. Angleton*, 269 F.Supp.2d 878, 885–87 (S.D.Tex.2003). Cassaday could have penned the note immediately prior to the suicide, but this fact is not apparent from the evidence at trial, and as the Supreme Court has explained, the imminence of death "must be exhibited in the evidence." *Shepard*, 290 U.S. at 100, 54 S.Ct. 22.

Second, even if Cassaday's suicide note were made in belief of impending death, it does not satisfy the second requirement of the dying declaration rule, that is, that the statement relate to the causes or circumstances of death. To be sure, some portions of the letter—reflecting his own role in the murder, his depression based on his relationship with petitioner—may relate to the circumstances leading Cassaday to take his own life. However, the portions of the letter specifically implicating petitioner do not do so, and merely relate to his attempt to accuse her of the crime. Such statements made in a suicide note do not relate to the cause or circumstances of the imminent death as required by the dying declaration exception. *See Angleton*, 269 F.Supp.2d at 888.

In short, the Court should conclude that the admission of the suicide note resulted

from an unreasonable application of the rule clearly established in *Crawford* that testimonial hearsay is barred by the Confrontation Clause in the absence of a prior opportunity for cross-examination. Further, the Court should conclude that, even if the Sixth Amendment contains an exception for dying declarations, the suicide note does not constitute a dying declaration.

Nevertheless, the Court should conclude that the error in the admission of this evidence was harmless, and that petitioner is therefore not entitled to habeas relief. In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court ruled that trial error does not entitle state prisoners to habeas relief unless the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Confrontation Clause violations are subject to harmless error analysis. *See Lilly v. Virginia,* 527 U.S. 116, 139–40, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Viewed in isolation, Cassaday's suicide note implicating petitioner was certainly damaging. However, in the context of the trial, the statement was cumulative of, and less significant than, petitioner's own statements describing her role in the crimes as reflected in the instant messages between her and Cassaday. Significantly, Cassaday's suicide note states only that petitioner was involved, without providing any details of that involvement. The instant messages, on the other hand, show in detail petitioner's active involvement in the instigation and planning of the murder. In these circumstances, where the improperly admitted evidence is cumulative of more damaging evidence which was properly admitted, it cannot be said that the admission of the note had a substantial and injurious effect on the jury's verdict. *Cf. United States v. Meserve,* 271 F.3d 314, 330 (1st Cir.2001); *United States v. Aba-*

*die,* 879 F.2d 1260, 1264 (5th Cir.1989). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this ground, notwithstanding the trial court's error in admitting the suicide note.

### b. *Instant Message Transcripts*

■ Petitioner's claims regarding the instant message transcripts are easily addressed. The instant messages are between petitioner and Cassaday, and discuss the planning for the murder. As such, Cassaday's statements are statements of a co-conspirator made in furtherance of the conspiracy. The courts, including the Sixth Circuit, have uniformly held that such co-conspirator statements do not constitute testimonial hearsay under *Crawford. See United States v. Stover,* 474 F.3d 904, 912–13 (6th Cir.2007); *see also, United States v. Allen,* 425 F.3d 1231, 1235 (9th Cir.2005); *United States v. Sanchez–Berrios,* 424 F.3d 65, 75 (1st Cir. 2005); *United States v. Jenkins,* 419 F.3d 614, 618 (7th Cir.2005); *United States v. Logan,* 419 F.3d 172, 178 (2d Cir.2005); *United States v. Robinson,* 367 F.3d 278, 292 n. 20 (5th Cir.2004); *United States v. Reyes,* 362 F.3d 536, 541 n. 4 (8th Cir. 2004). Petitioner's own statements are also co-conspirator statements as well as statements of a party opponent, which likewise do not constitute testimonial hearsay. *See United States v. Tolliver,* 454 F.3d 660, 665 (7th Cir.2006); *United States v. Brock,* No. 1:04–CR–188, 2005 WL 1334948, at *15 (E.D.Tenn. June 6, 2005).

■ Petitioner argues that Cassaday's efforts to preserve the instant messages demonstrates their testimonial nature. She points to testimony at trial that instant messages are not normally saved, and that the only way to save such messages is by actively printing them out or saving them to disc. The fact that Cassaday took these steps, petitioner argues,

shows that Cassaday intended to preserve these statements for use at trial, and thus that they are testimonial. This argument is without merit. Petitioner has cited, and I have found, no cases suggesting that an otherwise non-testimonial statement can be transformed into a testimonial statement by the mere fact of preservation. It is clear from *Crawford* and its progeny that the testimonial nature of a statement is determined by examining the circumstances surrounding its making. Nothing in the case law suggests that the act of preserving a statement by itself makes a statement testimonial. For example, a phone call between coconspirators yielding nontestimonial coconspirator statements does not become testimonial merely because it is recorded by government agents pursuant to a warrant. Nor would a business record prepared in the ordinary course of business become testimonial merely because it was preserved beyond the business's normal practice. And even if Cassaday's act of preservation established that his statements were testimonial because he intended them to be available for use as evidence in a later proceeding, there is nothing in Cassaday's preserving the instant messages which establishes that petitioner's own statements were intended for use at a later trial, and thus testimonial. In short, the rule which petitioner seeks to apply is not recognized in *Crawford* and its progeny, and even if it were the rule would not preclude the admission of petitioner's own statements in the instant messages.

█ Petitioner also suggests that the evidence at trial showed that the instant message transcripts could be easily manipulated. However, this was a matter going to the weight of the evidence for the jury to resolve, not a matter going to the evidence's admissibility under the Sixth Amendment. *See Whorton,* 127 S.Ct. at 1183 (noting *"Crawford's* elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements" and explaining that "[u]nder *Crawford* ... the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Feliz,* 467 F.3d 227, 232 (2d Cir.2006) ("Now, after *Crawford* and *Davis,* indicia of reliability play no role in the Confrontation Clause analysis. Rather, the inquiry under the Confrontation Clause is whether the statement at issue is testimonial. If so, the Confrontation Clause requirements of unavailability and prior cross-examination apply. If not, the Confrontation Clause poses no bar to the statement's admission."). Accordingly, the Court should conclude that the statements made by Cassaday and petition in the instant message transcripts were not testimonial, and that therefore their admission did not violate the Confrontation Clause.

### c. Cassaday's Instructions to His Brother

Finally, although devoting little argument to the matter, petitioner suggests that Mike Cassaday's testimony regarding his brother's instructions to him constituted inadmissible hearsay under the Confrontation Clause. This argument is without merit. Under Rule 801, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Mich. R. Evid. 801(c). Further, "statement" is defined as "an oral or written assertion[.]" Mich. R. Evid. 801(a). Here, Cassaday's direction to his brother is not a statement because it does not assert anything; it is merely a request which "contains no assertion. It is incapable of being true or false. It is a command, not an assertion, and cannot be hearsay because it doesn't qualify as a 'statement.'" *Peo-*

*ple v. Jones,* 228 Mich.App. 191, 204–05, 579 N.W.2d 82, 87 (1998). The introduction of such non-hearsay declarations does not implicate the Confrontation Clause. *See Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (noting that the Confrontation Clause the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this basis.

### E. *Evidentiary Claims (Claim II)*

Petitioner also raises several challenges to other items of evidence admitted at her trial which she contends were unfairly prejudicial. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

#### 1. *Clearly Established Law*

To the extent that petitioner contends she was denied a fair trial by the introduction of this evidence, petitioner must show more than that the evidence was erroneously admitted under state law. It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst,* 921 F.2d 882, 885 (9th Cir.1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988); *Davis v. Jabe,* 824 F.2d 483, 487 (6th Cir.1987). "[A] federal habeas court has nothing whatsoever to do with review-

ing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins,* 991 F.2d 1218, 1223 (5th Cir.1993).

As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow,* 25 F.3d 363, 370 (6th Cir.1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo,* 169 F.3d 1155, 1163 (8th Cir.1999); *see also, Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir.2001). Where a specific constitutional right—such as the right to confront witnesses or to present a defense—is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and ... the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle,* 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

#### 2. *Analysis*

##### a. *E–Mails, Pornographic Video, and Sexually Explicit Photographs*

■ Petitioner first contends that she was denied a fair trial by the introduction of sexually explicit e-mails between her and Cassaday, a pornographic video tape that she sent to Cassaday, and sexually explicit photographs. The Michigan Court of Appeals rejected petitioner's claims.

With respect to the e-mail communications, the court explained:

> [T]he nature of the relationship between Miller and Cassaday, as well as the circumstances surrounding Cassaday's reasons and motivation for coming to Michigan to kill the victim, were clearly relevant to proving a conspiracy between Miller and Cassaday. The e-mail messages between them were significantly probative of the relationship between Miller and Cassaday, and Cassaday's motivation for killing the victim. In particular, the e-mail messages revealed the level of intimacy between Miller and Cassaday from August 1999 through the days after the victim's death. Several e-mail messages demonstrated that Miller attempted to enrage Cassaday by claiming that the victim had abused her, and by claiming that she miscarried Cassaday's babies because of her husband's abuse. There were also e-mail communications demonstrating that Miller, while impersonating the victim, wrote Cassaday taunting messages. Further, given Miller's general denial of guilt, all elements of the crime of conspiracy were in issue.
>
> In addition, contrary to Miller's assertion, the e-mail messages were not unfairly prejudicial simply because some were sexually explicit. "Unfair prejudice" does not mean "damaging," as any relevant evidence will be damaging to some extent. Although several of the e-mail transmissions contained sexually explicit content, those characteristics formed the crux of the underlying issues in the crime for which Miller was accused.

*Miller*, 2003 WL 21465338, at *5, slip op. at 5–6. With respect to the photographs and videotape, the court of appeals explained that the evidence was relevant to "the prosecution's theory that Miller manipulated Cassaday to perform the killing. The photographs and video that Miller sent to Cassaday were significantly probative of the relationship between them, and of Cassaday's motivation for killing the victim." *Id.* at *6, slip op. at 6. Further, the court explained, petitioner has failed to demonstrate that the photographs and video were unduly prejudicial because a review of the evidence "discloses that they are not overly shocking or inflammatory on account of their sexual nature." *Id.*

Petitioner cannot show that the introduction of this evidence violated her right to a fair trial. As noted above, this Court does not sit to review the state court's evidentiary ruling, nor to reweigh the probative value and prejudicial effect of the evidence under Rule 403. Rather, this Court's task is limited to determining whether the evidence was so "unreliable that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). To be sure, the sexually explicit nature of the evidence may have had a prejudicial effect, and there could have been other ways of presenting the evidence which would not have been as prejudicial. On the other hand, there is no question that the nature of the relationship between Cassaday and petitioner was an important, if not central, issue in the case, and that the sexually explicit e-mails, photographs, and video best presented the precise nature of the relationship. And defense counsel spent a great deal of time discussing the entirety of the e-mail correspondence between petitioner and Cassaday, arguing that the correspondence showed that Cassaday did not kill petitioner's husband and that she had not asked him to do so. *See* Trial Tr., Vol. V, at 1393–1409. In light of the evidence presented and the prosecutor's theory of the case, it cannot be said that the sexually explicit evidence was so prejudicial relative

to its probative value that its introduction deprived petitioner of a fair trial. *Cf. United States v. Burdette,* 86 Fed.Appx. 121, 128–29 (6th Cir.2004). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. *Photographs of Cassaday's Suicide*

▮▮▮▮ Petitioner also contends that she was denied a fair trial by the introduction of photographs showing Cassaday's suicide, and in particular a photograph showing Cassaday holding an open Bible. The Court should disagree. As a general rule, "truly relevant photographs are admissible regardless of their inflammatory nature." *Dowthitt v. Johnson,* 180 F.Supp.2d 832, 880 (S.D.Tex.2000). Here, there is no dispute that Cassaday's suicide was relevant evidence in the case. The fact that petitioner did not dispute the suicide did not render the admission of the photograph impermissible, as it is a "familiar, standard rule that the prosecutor is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief v. United States,* 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. *Cumulative Effect*

▮▮▮ Finally, petitioner contends that she was denied a fair trial by the cumulative effect of the prejudicial evidence. This claim is without merit, and the Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair."

*Payne v. Janasz,* 711 F.2d 1305, 1316 (6th Cir.1983) (Jones, J., dissenting); *accord Walker v. Engle,* 703 F.2d 959, 968 (6th Cir.1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002); *United States v. Lumpkin,* 192 F.3d 280, 290 (2d Cir.1999); *McKinnon v. Ohio,* No. 94–4256, 1995 WL 570918, at *12 (6th Cir. Sept.27, 1995); *Fero v. Kerby,* 39 F.3d 1462, 1475 (10th Cir.1994). Because the evidence was properly admitted, petitioner's cumulative error claim is without merit.

### F. *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's confrontation claim relating to Cassaday's suicide note was an unreasonable application of *Crawford,* but that the error was harmless. The Court should also conclude that petitioner's remaining claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

### III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,*

638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir.1991). *Smith v. Detroit Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

May 21, 2007.